We will hear argument this morning in Case No. 14-614, Hughes, Chairman of the Maryland Public Service Commission v. Talen Energy Marketing and the consolidated case. Mr. Strauss. Mr. Chief Justice, and may it please the Court, Maryland determined that new generation was needed for local reliability, so it directed its retail utilities to sign 20-year contracts with a competitively selected project developer. Maryland's action did not intrude on Federal authority, primarily for two reasons. The first reason is that Maryland's new resource did not distort the wholesale capacity auction. FERC revised its auction bidding rules to require the Maryland resource to bid on the basis of its costs, backing out any State contract revenue. The developer bid in accordance with the rules and cleared the auction. FERC says that means that the resource is economic, needed, competitive, and does not suppress prices, any State revenue notwithstanding. The second reason is that Well, if it doesn't suppress prices, why did Maryland do it? Maryland did it, Your Honor, because they saw a need for generation going forward. As is clear in the generation order, Maryland perceived a problem. It had large coal units that it believed were going to retire in the coming years, and it needed to have resources in place to be able to meet that need. So it undertook to have those resources built pursuant to the contract mechanism before you. But if that hadn't happened, prices would have been higher. So it was to suppress prices. No, it was not to suppress prices. And frankly, Your Honor, it could not have suppressed prices. FERC revised the rules in 2011 to be clear that the resource had to bid on the basis of its costs without regard to the State revenue. So there was no way for it to suppress prices. If the costs had been too high for the resource, it would never have cleared. It wouldn't have been in the market at all. It was only in the market because it was able to clear on the basis of its costs, which showed it was efficient. And FERC made that finding. FERC found it needed, competitive, and not suppressive of prices, notwithstanding the subsidy. Well, why was this done through stepping on FERC's turf at all? I mean, could it have been done by requiring long-term contracts with the new generator? It was done through a long-term contract, Your Honor. But the question of getting involved with FERC's turf is as follows. FERC has set up the capacity auction in PJM. And under that auction, PJM procures three years in advance for a one-year period all the capacity the region needs. And then it allocates the cost of that capacity among all the utilities. But it tells the utilities that you have a way to hedge against those costs. If you have long-term resources, resources that you bought or procured through contract, you can bid them in, and if they clear, they will offset the cost. Maryland's concern was this. It wanted and needed the resource, but it was concerned that the resource clears so that it hedged against the cost and customers not pay twice for the same resource. So in order to do that, it entered into the contract for differences. And the way it did that was it did a competitive procurement and found a developer who was willing to undertake the risk of nonclearance. And that was the issue. The contract for differences assigns and allocates that risk to the developer, not the State. And that enabled the resource to go forward in a way that would not result in any possibility of a double charge. The contract developer, the developer receives the contract price. The utilities pay the contract price, and no more than that, receive the market price. That is exactly the way this would have worked if we had simply done it as a bilateral, with one key difference. The difference is that the risk of nonclearance is with the developer. Alitoson Well, there's another key difference. If you had done it directly with — if CPV had contracted directly with the distribution utilities, that would have been subject to regulation by FERC, would it not? Maryland Yes, this contract was as well. Alitoson Only after you lost on the Fourth Circuit did you concede that. Isn't that correct? On the very day of the Fourth Circuit's decision. Maryland No, Your Honor. Alitoson No. Maryland Let me explain why. In the district court, during the district court litigation, CPV obtained market-based rate authority from the FERC and filed a motion with the court telling the court that the case should be dismissed because the contract was being entered into pursuant to that authority. And that made it a FERC contract that could be reviewed at FERC. So any party could have filed a complaint. Alitoson But your initial position was that it did not have to be reviewed by FERC, wasn't that right? Maryland That's correct. That's correct. The position below was that it was either of two things, Your Honor. Either it was a non-jurisdictional financing arrangement or it was a FERC jurisdictional contract. But either way, it was not preempted, and that was the question. It was either subject to FERC's jurisdiction or outside it. But the question of whether it was preempted would not have been — the answer would have been the same regardless. The district court decided that it would deal with that motion in its order and decided in its opinion that while it probably was a FERC jurisdictional contract, the judge went ahead and found what Maryland had done unconstitutional. Kagan I'm not sure why it is that when you say it was subject to FERC's jurisdiction, that doesn't end the case right there against you. Because if it's subject to FERC's jurisdiction, that means it's a wholesale sale. And that's for FERC to do, is to set the rates and other terms of wholesale sales. And that's not for the States to do. So, you know, that means you're preempted. Alitoson No, no. No, it does not. You're exactly right, Your Honor. A wholesale sale is for FERC to review. But the way the statute works, sellers under the statute are permitted to set rates as an initial matter by contract or tariff. FERC superintends that process, as this Court decided in the NRG case a number of years ago. In this case, the developer, the seller, set the rate through a contract entered into with the State utilities. That contract would be subject to FERC review. That's just another day on the scope of our argument. Kagan But Maryland didn't set the rate just because they use an auction? Is that what you're saying? Alitoson Maryland did not set the rate because Maryland did not select the price. The price was selected by the seller. Kagan Well, that's true of FERC itself. FERC doesn't set rates anymore either. It allows an auction to set rates. But we would never say that that doesn't mean that they're FERC rates, that they're FERC-approved rates. And so here, the fact that Maryland decided not to set rates directly, but to allow an auction to do it, I mean, that's not just a mechanism that Maryland chose. They're still Maryland's rates. Alitoson The auction that FERC designed, the wholesale auction, permits, if not incentivizes, exactly what was done here. FERC has made that very clear. The purpose of the auction is to, in part, to provide information to the market about what kinds of long-term contracting are needed. Kennedy But you used the auction dynamic, the auction mechanism, to go outside of the market of that dynamic. Alitoson What you did was perfect — yes, Your Honor, but that's perfectly permissible. Remember the — Kennedy That's — that's — Alitoson Let me explain. Kennedy I'm sure that that's one of the issues in the case. Alitoson Yes, Your Honor. The auction dynamic allows for parties, and indeed encourages parties, to enter into long-term contracts for capacity resources and bid them into the auction. But they can't clear the auction. They don't become auction resources unless they're able to do so. And in this case, FERC had in front of it exactly what Maryland and a related program in New Jersey were about at the time they revised the rules. What FERC sought to do was to reconcile the issue of the State programs and how they would interact with the auction, and FERC did that. It set a different bidding process, and Maryland followed that bidding process. The CPV resource bid in accordance with it and cleared on that basis. Alitoson But as originally set up, CPV had no incentive to — to bid anything other than zero. Isn't that right? Kennedy That is correct. Alitoson All it was interested in was clearing the market. Kennedy That is correct. Alitoson And that affects the — the dynamic of the — of the — of the PJM auction, does it not? Kennedy Yes. Yes, Justice Alito, it does. And that's why in 2011, FERC, when it became aware that this had happened, changed the rules. Remember, originally when FERC approved the auction in 2006, it said that State resources that were being built for reliability, which is exactly what this resource is, could bid in at zero, at zero price and clear automatically, in order to ensure that States could meet their responsibilities to ensure reliability. In 2011, when FERC became aware of the Maryland and New Jersey programs, it revised the rules. But it didn't prohibit those resources. It didn't preclude them. It changed the rules so that they could continue to bid, but they had to bid on a cost basis. Sotomayor But — but I have to say that they also looked at a long-term contract FERC did in PJM — in the PJM interconnection order, and it determined that a 7-year lock-in period for a new generator was unfair, unjust, and unreasonable. It's something it can do. Why didn't that end what you're doing? Kennedy Your Honor — Sotomayor — have no incentive to bid anything other than zero. I don't understand why this case is not ended by FERC's determination that lock-in contracts are unjust and unreasonable. Kennedy FERC determined that under the auction, it would not allow a guarantee of more than 3 years. But FERC did not at that time say that long-term contracts outside the auction were prohibited. Long-term contracts are a staple of this industry, as this Court knows, and FERC was not trying to prohibit them. What FERC was doing there was the 3-year lock-in, which I think is what you're alluding to, Justice Sotomayor — Sotomayor How is it different than your contract? Kennedy It's different in that this is a 20-year agreement. Sotomayor No, I know the years are different, but I'm talking about the mechanics. Kennedy The mechanics of it are that it operates outside the auction but bids into the auction. The new entry price adjustment to which you refer functions within the auction and for a very specific purpose. It's designed to address the situation in which you have a relatively small geographic zone and a relatively large plant that's built. The concern is that when you build that resource and put it in the market, it creates a glut and prices will crater. And the concern was because of that, no one will ever build such a resource. So the auction allows you to lock those prices in for 3 years. But that's simply in that particular circumstance. What FERC said when asked to make it longer was, that's not the purpose of the auction. The auction is not intended to ensure revenue certainty. It's intended to provide information, information that the market can use in making contracting decisions. And that is exactly what happened here. Maryland looked at the auction results, came up with a program to have a resource built outside the auction, which would then bid into the auction. But it had to do it in accordance with FERC rules. FERC is the gatekeeper of the auction. Maryland couldn't insert itself into the auction in a way that FERC didn't allow, even if it wanted to. Sotomayor Mr. Strauss I didn't. I didn't. I have to admit for myself, in this kind of brief, it would have been much, much easier if people had used simplified examples with real numbers. I have a hard time thinking in terms of simply abstract words. But as far as I understand it, my law clerk says that this cost-based system of FERC is that the minimum offer price has to be set, that is, they have to set a price at 90 percent of the cost of new entry for a combustion turbine generator or a combined cycle generator. That's as they calculated, PJM. Or if it's neither of those two kinds of generators, it's at 70 percent. Is that correct? I believe that is, Your Honor. Breyer If that's correct, then if I have a generator up somewhere in the hills of surrounding their hills in Maryland, and it's more expensive to get coal up into those hills or oil or natural gas, and so I have a generator that I can, 500 megawatts, and it allows me, based on cost, to charge, if I were to charge the full cost, I would charge the full cost, and that depends on the banks and loans and so forth, it allows me to charge $220 a megawatt day. Okay? Okay. Does that? I can go to FERC and I can say 70 percent of that is what I am going to put into the pool, because I know that Maryland will give me the rest. And this is not one of those two kinds. And 70 percent of 220 is around, I don't know, my math isn't too good, 180. So they get awarded the contract, because it's 180. But there are some other firms that are more expensive over here, and those other firms don't get into it at all, because we used up all the generating capacity that we needed for the next 5 years with your firm and a few others. And that changes rather dramatically who supplies the contract, and it also changes the price at which retailers across PJM will pay for the electricity they are getting from the pool. Now, is that right? That's either right or wrong. Well, Your Honor — If it's right, it seems like the end of the matter. Well — If it's wrong, then you explain to me why. Here's what's going on, Your Honor. If the cost of the generator is below the default price, that 90 or 70 percent price that you described, the generator is — that is its offer floor, and the generator is permitted to — Now, I'm assuming that the cost is higher than the 70 percent. That might be a problem, but I have two answers to that, Your Honor. First of all, that was not this case. In this case, the resource bid on the basis of its cost and its cost-based number was below the default price, so there was no issue of what you've described as a resource with a cost above the default price that gets to bid the default. So you're asking only for the case where it's below. You're not interested in the case where it's above. And this whole case has been argued only in the case where it's below. Well, that is actually what happens, Your Honor. I'm not saying what happens. I'm saying we have to decide a legal issue. Is my legal issue to include my example, or is it not? I think it does not include your example, Your Honor. That is a different kind of distortion. The Solicitor General mentions it in its brief. And if FERC in 2011, when they revised the minimum offer rule, did not find reason to adjust the offer level higher, which might have limited that problem. If FERC now believes that that distortion exists. I don't want to use up all your time. I'd like to reserve the balance for rebuttal, Your Honor. Thank you. Thank you, counsel. Mr. Elgarten. Mr. Chief Justice, and may it please the Court, let me respond first to Justice The way the Federal Power Act works is states have the power and the authority recognized by FERC on the purchasing end of any contract to direct their local utilities to enter into any contract they want. When they direct a purchaser to do so, that gives rise to a contract that is certainly within FERC's jurisdiction to review. They review the rates charged on the other side of the contract, the seller's side of the contract, and they review the ultimate contract itself. But the notion that you are setting the rate by engaging in a contract with a seller is completely inconsistent with what has always been, and I can only say always been, the rule. And that's how the Federal Power Act is written, as set forth in our reply brief. The Federal Power Act supplies jurisdiction on the seller's side of those rates. If I understand what you just said, you're not relying on Mr. Strauss's argument. Mr. Strauss said that this wasn't a whole — setting a wholesale rate because Maryland did it by auction. But you're saying that that's irrelevant, that Maryland could have just picked a price and that that would have been fine so long as at some point FERC had the power to review and veto it. Is that what you're saying? No. It's a fair point, but no, Maryland could not have picked a price. It could not impose that price on the seller. The longstanding rule of FERC has been if it's competitively set by the seller, leaving the seller free to respond to the bid of the purchaser, then it is subject to FERC, and that review process is there. And it is not inconsistent with Mr. Strauss's position. In the specific circumstance of an auction, what we had here — I guess I don't understand that. I mean, just take a hypothetical case where Maryland said to all its utilities, this is the price and this is the only price that you will pay for electricity. It crosses the line. Are you saying that Maryland could do that? I believe Maryland — there's a case from the commission that says that would cross the line. I am imposing a price that all my utilities would sell. That crosses the line. Kagan, you are saying that everything's dependent on the difference between picking a price and letting an auction pick a price. But I guess I'll repeat the question that I made to Mr. Strauss. I mean, we know that one of the ways that you pick a price is by letting an auction determine that price. That's exactly what FERC does. We did — we had a competitive bid to build a power plant. That's what was set up here. We were talking — in answering your first question, I was answering the conceptual question of what it is FERC regulates. FERC regulates the seller side of every transaction. In the auction context, things get a little more complicated, as you just discussed in the EPSA case. This case, however, was a procurement to build a power plant. CPV bid to build this power plant. It looked at the costs it would take to build a power plant in this locale. How much turbines cost, how much it would cost to run the plant and to bid into the market and make it available to the market. Of course, it then divided the price over the 20 years. You have 240 monthly payments. That's exactly what we bid. We understood that for Maryland to pay for us to build a power plant and to keep all the profits from our sales in the markets — both the energy sales and capacity sales, both were involved — that would be unfair. They didn't want their rate payers to both finance our power plant construction, which is what Maryland was after, and keep all the revenues. So the contract reads — and this is on page 17 of the reply brief — the contract reads, we turn over all the revenues for 20 years and we build the power plant. They pay us to build the power plant. We turn over the revenues. It is correct enough that the net of that is the difference between the revenues and the price. But the purchase here was to build the power plant. Now, how did it impact the auction? How does it impact the auction? The auction was always set up by FERC on the understanding that States have the inherent power — and I mean the reserve power under the Federal Power Act itself — to direct these kinds of long-term contracts, to direct capacity purchases outside, because they control the purchasing decisions of their local utilities every single day. They review them and they control them. And they understood that States would be using long-term contracts to support new generation. So FERC didn't just as an act of grace allow constant sales of capacity outside the auction. They constructed the auction against the existing authority of the States to do exactly what was done here. Would it be correct or incorrect to say that under Maryland law, you entered — you entered the auction and as a result you altered the consequences of that auction in a way that was inconsistent with FERC's policy? Is that a fair and unfair statement? No. It is not fair. Because FERC's policy, it was expressed. They said when States do exactly what was done here, before they even set up the auction and then in fact, they said if States do what we do here, we have a mechanism in our auction not to correct it, to adjust the auction so the auction still functions. And that was the point Mr. Strauss was making. The minimum offer price rule, which has two formats, is acceptable to FERC, because FERC says if you comply with that rule, it does not artificially suppress prices. That was FERC's judgment, whether it was a 70 percent or an 80 percent situation of how you bid. FERC has determined that is competitive, economic — these are quotes — does not — does not artificially suppress prices because FERC wants those bids in. You're a competitive resource. In our case, however, we didn't even use that default price. We used a pure cost-based price. So the concern the government expresses that there's a possibility of an exception, which they say they haven't corrected. I think FERC did it on purpose and said it doesn't suppress prices. The possibility of that exception is eliminated. We were — we — in our case, because we bid a pure cost-based bid. And when you bid a pure cost-based bid, does it affect the market? Of course. The addition of supply affects the market. FERC doesn't think that's a bad thing. FERC thinks that's a wonderful thing. Breyer. That's another problem I have here. I don't spend more than a minute on this. But I don't understand the procedural posture of this case. That is, it seemed to me it started out by saying that there was a supremacy clause, private right of action or something, which I think there isn't, in my opinion. And then — and then it seemed to go, we don't have FERC's opinion. We only have it through the FSG. I thought there was a doctrine called primary jurisdiction, where if the agency really — their views was really relevant on that, you got their views directly. What happened to all that? We want to be in front of the commission. We believe the commission should decide these issues. We think the commission would decide these issues favorably to us because they have done so in connection with this very case. When the issue arose of this offer being presented — But I don't understand your position. You're arguing that FERC does not think that this adversely affects the auction. Is that what you're saying? Adversely affects the auction. It affects the auction. Why — why has FERC filed a brief arguing the opposite? You're arguing as if it's not even here. If you read — if you read the FERC's decisions that we've cited, the 135 and 137 FERC, that's how it's numbered in the briefs. If you read that and you read the quotes, they're included in the joint appendix, you will see that FERC has determined that these bids are competitive if they're submitted in this way. So you say that FERC doesn't understand its own order? I'm saying FERC's, as happened in the Morgan Stanley case, there is a little bit of changing of tunes that's at issue here. If this issue was presented to the commission, which is exactly who should decide these issues of energy policy — not this Court, whether something artificially suppresses — these kinds of issues of energy policy and how the auction should work should be decided by FERC. Under this Court's case, Northwest Central, it says if the issue between the Federal authority can be reconciled, and they were reconciled, with these specific contracts in front of us, FERC modified the rules to allow exactly this bid and determined that it did not artificially suppress prices. Does it affect prices? Of course. New supply affects prices. Does it artificially do that? SOTOMAYOR How would this — how would this work normally? Meaning, forget that a lawsuit was started. You enter into this contract. Do you have to submit the contract to FERC? No, because we have what's called market-based rate authority. It's been discussed in your cases, so we notify them. Anyone can protest to FERC.  Anyone who believes this — SOTOMAYOR Did somebody protest here? They didn't. They — well, they — we thought they did. They raised an objection. They said this is adversely affecting the auction. FERC resolved their objection. FERC had in front of it the very complaints we have here, the complaints about — excuse me — the RFPs and the solicitations from New Jersey and Maryland, and they presented this to FERC. FERC said, ah, we take care of this in our auction. We've always known how, with the minimum offer price rule. They said the minimum offer price rule, when it is applied, will result in not artificially suppressing prices. That is how this was presented to FERC, with these specific contracts. They're in — they're in volume three of the Fourth — Fourth Circuit appendix. These specific contracts. Now, if they want to protest it again and say these have rates or the rates that affect the jurisdiction, they're free to protest it yet again. And I am — I believe FERC would come up with the same conclusion again and say this is perfectly appropriate to bid into the auction in this way. Now, if somebody wants to petition, let's close this, what they're calling the loophole, the one that Justice Breyer suggested, because it doesn't require a bid at exactly a cost-based price. They can go to FERC and close that loophole. It wouldn't have affected our case at all because we bid a cost-based, but they can go to FERC on every one. All of the conflict preemption issues should be addressed to FERC. They are not really for this Court, which is obviously having some trouble conceptualizing how this all works, to resolve. Those conflict preemption on the Northwest Central issues go to FERC. They should not — You wouldn't get conflict preemption if field preemption applies. That's absolutely correct. And so on the issue of field preemption, have we exercised an authority that belongs to FERC? No. By setting — by directing a contract or competitively soliciting, we are not setting the rate. If we did, the hypothetical from Justice Alito, if we said everybody in the State must pay that rate, FERC has dealt with that issue. That crosses the line. Competitive solicitations do not. When the purchaser — But what is your explanation for why FERC is on the other side now, when you're saying it was in your corner earlier? FERC, as the Commission, through its rulings and orders, based on evidence and appeal, as reflected in the New Jersey appeal, the NJBPU appeal of that order, they were on our side. When they were asked to join this case, the Third Circuit said get in. They had two weeks. I think they took an ill-advised position. But it's certainly not a position that was done on the record subject to an order. And that's what's decisive here. Thank you, counsel. Mr. Clement. Mr. Chief Justice, and may it please the Court, Maryland's effort to dictate what CPV receives in connection with its wholesale sales to the wholesale market operator is plainly preempted. Maryland's targeting of the Federal market was direct in this case. CPV gets nothing unless it bids and clears the PJM auction. Once it does, it must sell all of its output, all of its energy and capacity to PJM. If those things happen, then CPV receives, thanks to the State of Maryland and its State action, payment streams in conjunction, in connection with those sales to PJM that are different from and far more stable than the prevailing price on the PJM auction. And for the The way that they've described it to me, I'll try this once more. Because truer words were never spoke, and I am not quite on top of how this thing works. But the way he described it is what they're bidding into the PJM is their real cost. And when they're bidding their real cost, Maryland isn't going to pay them a dime. If they're an inframarginal unit, which I assume they would be, the cost for PJM is going to be higher, not lower. And there will be extra money. So what they're going to do is they're going to be paying Maryland. Now, what they said is, we're going to be paying. Oh, he's shaking his head, so I haven't got that right either. No, no, I have got it right. I don't know. I'm guessing you're getting it right. Maybe not. Anyway, well, you see my problem. I'm just understanding that. I guess I see your problem, which is I think first there's a factual premise there, which is I think it's pretty much conceded that at least in the first couple of years of this, the expectation is that CPV is going to be receiving an additional payment, a forced payment, from the LSE, the load-serving entity, to PJM. So that's just a factual premise for you. But are they bidding their true cost into PJM? Well, they sure didn't start that way. And let me start here. I mean, they had, as I think Justice Alito alluded to, a completely different incentive in bidding their costs into PJM than would a private generator with new capacity. A private generator with new capacity is going to build its actual — bid in its actual costs, because they don't want to clear at the expense of having an unprofitable generator. It's a completely different dynamic for somebody like CPV, because the bid and clear requirement for them is just an obstacle to get to the pot of gold at the end of the rainbow, which is all these guaranteed payments for 20 years. So they have every incentive to understate their cost. That incentive was realized here. They talked about bidding in their costs. When they first bid in their costs, they bid in their costs at less than $14 a megawatt date. Okay? Now, when PJM took a look at that, they ended up upping the figure sevenfold to about $96. So that's a great measure of their incentive to distort their costs for — for — now, what they will say is, ah, but, Mr. Clement, the $96 bid cleared, and that's all that matters. Well, with all due respect, that's wrong. FERC says it's wrong. A bid like this can still have a price effect — suppressive effect, and you can see that in a couple of ways. I want to say one thing, though, is FERC is here on our side in part because they are on its record as saying this MOPR, the minimum offer price rule, the MOPR is not some sort of cure-all that is designed to ward off any price-suppressive bid. It is a default rule. It is a coarse screen to deal with the most egregious cost-reducing bids. It also depends on an estimate of cost. And here's why it doesn't really work for a bid like this. One of the most important costs is your cost of capital. Well, what was CPB's cost of capital without this program? They told you — they told Maryland, without the 20-year guarantee, we can't get any financing for this project. We can't do it. At the bench trial, they told the district court, our ability to bid this project depends entirely on the — Breyer. That's another way of saying that the bid that FERC says that they have to make is not their actual costs, because if, in fact, it's based on a cost of capital that is lower than what the cost of capital really is, that is a misstatement of their cost or a lower-than-actual cost, just as much as if the steel were, in fact, less expensive than what they actually have to pay. Absolutely. And, of course, another component of cost is going to be future fuel costs. And anybody who's been to the pump lately knows that we can all have a lot of variance as to what we think are going to be future fuel costs. But if I could return to the capital cost and just finish this point, it's even worse than it's misstated, because ultimately, because they're getting a 20-year guarantee and no one else is, everybody else is calculating their cost of a new generation financing based on the 3-year price signal that the — that the — that the capacity market is sending, it destroys the ability to do an apples-to-apples comparison. And then the one thing we know for certain here is that this project ended up displacing a project that actually could be built based on the 3-year forward price and without a 20-year contract. But you'd have — you'd have no objection if Maryland just decided to subsidize the construction of the plant, would you? We would, Your Honor. I think it might be a harder case. But particularly if the subsidy was conditioned on a bid-and-clear requirement, I would be here making a preemption argument. You might not think it's as good of a preemption argument, and I think the only difference is because the statutory text of the Federal Power Act that seems to me to make our position clearly correct is the provision that says that FERC has the authority to dictate what a seller receives in connection with a wholesale sale. I am — How do you define the field that's preempted? Well, I think the field that is preempted is the ability of a government actor to set wholesale rates for wholesale sales. And so if you have State action that sets rates for wholesale sales, and rates in this context is defined by the statute as including what a seller receives for wholesale sales, we think that's preempted. Are they — are they setting rates by having entered the auction? We certainly think so. And more importantly, I think for purposes of this case, so did the district court. I mean, it's kind of odd for me to hear my friends on the other side — as I heard them in the colloquy with Justice Kagan, they essentially conceded they lose if Maryland sets the rates. And that would be an odd concession in any case, but particularly where at footnote 48 of the district court's opinion, the district court finds, as a matter of fact — I'll concede it's a mixed question of fact and law and all — but still, there it is, the district court — But in a sense, I guess all of the bidders in the conventional auction, in effect, set the rates by their bid. Sure. And I think what Justice Kagan alluded to is if Maryland's — So why is this different? Well, it's — it's not, because I think the point is if Maryland's not setting the rates here, then FERC's not setting any wholesale rates. And that's not right. And so just because you use an auction mechanism to set the rate, that doesn't mean that it's not the State setting the rate. And if you look at footnote 48, it's — it's — it goes beyond that, because based on particular findings, based on the testimony of the chairman of the Maryland PSC, the district court said that actually, because there was back and forth between Maryland and CPV, this was Maryland setting the rates. So is Maryland setting the rates when it subsidizes the construction of a power plant? Well, if — Mr. Chief Justice, suppose they decided to — I mean, potentially they could. Not all subsidies are created equal. If they had a subsidy that was measured, a dollar-for-dollar subsidy based on sales to PJM, I would think that would actually be setting the rate. Again, you might disagree with me, but I would say that in that case, you would have a very similar situation. I think this case is that much clearer because these payments from the LSC is directly conditioned on selling to PJM. Mr. Clement, can you tell me how I write this opinion, and I'll ask you why. Okay. As I look at the relevant statutory provisions, what it says is that FERC has the power to ensure that rates that are set are fair, are just, and reasonable. So it doesn't say it gets to set the rates. It says it can do rules and regulations that control how the rates are set, so that I'm not sure how this is field preemption. At best, I think it might be conflict preemption. And so if I think it's conflict preemption, that something about Maryland's plan conflicts with the system that FERC has set in place, how do I articulate the rule in this case? What is it that conflicts with FERC's rules and regulations with respect to setting — participating in the market? In the auction? Sure. Because as I understand it, and I don't think you've told me any differently, that the people who are auctioning in the market can and do enter into contracts with States on a regular basis. Not with contracts with the States. That's not what my friend on the other side is saying. They enter into voluntary bilateral contracts off of the market. Exactly. And that is not what's happened here. All right. Voluntary contracts outside the market. Right. Why is this involuntary? Because the State told the load-serving entities that they had to make these payments to CPV. And it's kind of the same thing. I'm trying to articulate the preemption rule in some simplified way. I'm a little bit like Justice Breyer on this. I'm not quite sure how everything is working. But I don't think it can be field preemption, because you have to explain what field we're talking about and what rule we're setting in the future. I think it's conflict preemption. I think it's both, Your Honor. I think part of the reason this is difficult is because it's like an overdetermined equation. There is both field preemption here, but there's also conflict preemption. And there are multiple evidences of conflict preemption, because nobody's tried to do anything like this before. So give me a simple – when I write this opinion, give me the first paragraph. This conflicts with what? This conflicts with FERC's determination that the PJM rates for the PJM auctions are just and reasonable. As you said, the starting premise here is the statute gives FERC the authority to determine whether wholesale rates are just and reasonable. FERC has done that effectively ex ante with respect to the PJM markets. By its regulations of PJM, FERC has said that the auction clearing rate for sales to PJM is just and reasonable. Now, the authority of FERC extends not just to what the nominal rate is in the auction, but to what the supplier receives in connection with that sale. So if a State through State action says, it's all very well, CPV, that you've sold that to PJM and PJM has given you 100. This is your lucky day. We're going to give you another 50. That is clearly preempted because a State is having the supplier receive something in connection with a wholesale sale to PJM that is different from the rate that FERC has determined is reasonable. Breyer. Let me try that with the example. 5,000 new megawatts of capacity is needed. Existing suppliers can't supply more than 4. So FERC is trying to get an extra 1,000. The people whom it will choose to give it and will allow to bid are those who are the new people who have the lowest cost. All of those people in a rising market will have higher costs than the existing people. So if, in fact, FERC looks to the existing people and says, which can bid, and says you have to use your real cost, and if they really implement that, what you just said is going to have no effect on the market, because they will be in the market whether they're given a subsidy or whether they're not given a subsidy. And, indeed, it won't affect the price because the price is affected only by the marginal to see what these people's costs are. Therefore, it is without impact. And they add to that, we would like to make this argument to FERC, where they have to focus on it and not just say in general to the SG this is how we think, because by the time we're finished, we'll be able to modify present rules so that they will see that they are not hurt at all in the actual world by our costs. I did get something like that out of what they said. Maybe I'm wrong in what they think. Maybe they'll just agree because they think I'm agreeing with them at the moment. But I would like to know some response to that. Here's your response, Justice Breyer, and it comes in two parts, because there's at least two parts to that question. First, I take issue with the premise, because it may be that some new generation will come in, in your hypothetical, but it won't necessarily be this one. And in fact, here we know as a matter of fact that it wouldn't be this one, except for the 20-year guarantee. And so they've displaced somebody. But please don't just shrug your shoulders. No, no, I'm agreeing with you. I am agreeing. That's a huge — Not shrugging my shoulders. That is a huge difference, because the message this all sends to my clients is don't take FERC's direction that you should be competing based on market forces and efficiency. We should stop competing efficiently on the PJM and try to put the best bid together based on the 3-year advanced auction. We should start competing for subsidies, and we should start competing for guarantees, the second part of your question. What about FERC primary jurisdiction? This is all a bit rich coming from my friends on the other side, because, as Justice to do with FERC at all. This is a financial arrangement that FERC can't even look at. Then my friend talks about how, well, they eventually got market-based rate authority from FERC in a submission. Well, I'd ask you to take a look at what they said on Joint Appendix page 142 of that submission. What they said about the contract is they said, quote, ''CPV Maryland also notes that it included the CFD in this application solely for informational purposes and is not requesting that the Commission address or discuss Commission jurisdiction over the CFD in its decision on CPV's Maryland's request for market-based rate.'' Don't look what's behind that curtain, Mr. FERC. We don't want you to do anything with that. We're just here to try to get market-based rate authority. For them now to come in, not having raised any objection to the Supremacy Clause, cause of action, and by the way, there was a Commerce Clause, cause of action there as well, which is maybe why the parties overlooked it, and I do think that's not jurisdictional. So I think we're past that. So for them to come in now and say, oh, this has to go to FERC, I'm sorry, it's a bit rich, and I understood why they were making the MOPR argument at the early stages of this litigation before FERC filed the brief, but I am a little mystified why at this late stage of the game, after FERC has filed three briefs saying that the MOPR is not sufficient to eliminate price-suppressive bids, that they're still saying we win because FERC's on our side. I mean, that is a bit mystifying, and I think FERC is absolutely right on this for the reasons that we've already talked about. I mean, you can't really even apply the MOPR in an apples-to-apples way if you have this kind of 20-year guarantee, because the cost of capitals are completely out of whack. And, of course, they do have the problem that their own testimony is they wouldn't be on the market at all if they didn't have this 20-year guarantee. So in the first capacity auction that we had to deal with, the price was suppressed. In every energy auction since then, the price was suppressed. And that's why I think FERC, you know, they never tried to design the MOPR as this perfect thing. You talked about the 90 percent and the 70 percent. Way back in one of those proceedings, my client said, FERC, why isn't it 100 percent? If you think about the economics of this, it should be 100 percent. And FERC's response was, eh, close counts. This isn't perfect. We don't pretend it's perfect, so we think 90 percent is a rough compromise. Fair enough. Probably not arbitrary and capricious, but it doesn't mean that this is something that the MOPR is some perfect solution. I also don't think there's anything terribly anomalous about the procedural posture of this case. I think it's the exact procedural posture you had in front of you in the Snidewind case. That was a district court action, declaratory judgment for preemption. What I think makes this a preemption case and what completely distinguishes voluntary bilateral contracts is State action. It's the State action forcing the LSEs to make these payments and essentially conditioning CPVs' participation on the PJM market on the bid and clear requirement. That's State action that's preempted. In the typical voluntary bilateral contract, you don't have State action. The parties make their agreement. They eventually submit it to FERC, or if it's a market-based rate, somebody can object, and the only time you really get State action at that point is at the very end of the process when the State's doing retail rate regulation, and that's the point where Mississippi Power and Light and Nodahala come in and say, if at that late stage when there's finally State action, the State has to take FERC's wholesale rate determinations as a given. They can't second-guess them at that late stage. But here you've got the State action right up front, and the State action is preempted. Kagan. Mr. Clemente, it does seem to be important what the kind of State action is, and this goes back to the question that the Chief Justice raised with you. If the State had just said, we need another power plant, and had delivered a load of money to CPV and said, go build a power plant, you're not saying that that would be preempted, are you? If it's not at all, it doesn't – you know, that's going to have an effect on the outcomes of the auction process, you wouldn't say that's preempted, would you? It would depend. I mean, the way you just described it, I would say, especially because I think it's a helpful answer, of course not, not preempted. But if they conditioned all of that money on a bid-and-clear requirement, I would be saying that that was preempted. I think it's a harder case, but I'd hate to lose that case here, because there are cases like that that are being litigated in the lower court. Thank you, Your Honor. Thank you, counsel. Ms. O'Connell. Mr. Chief Justice, and may it please the Court. In the government's view, the Maryland generation order is preempted because by requiring the state-selected generator to bid into and clear the PJM capacity auction in order to receive the guaranteed payments provided in the contract, the Maryland program directly intrudes on the Federal auction, and it also interferes with the free market mechanism that FERC has approved for setting capacity prices in that auction. Do you have a position on the question that Mr. Clement avoided about what if the State subsidized the power plant? Is that good or bad? I agree with Mr. Clement's answer. If the State just — What was Mr. Clement's answer? If the State — if the State just paid to build a power plant, that's not directly targeting what's happening in the PJM auction. Sure, it's adding supply to the market, but as long as the State is staying within its sphere under the Federal Power Act, that's fine. But I also agree with the second part of his answer, which is that if there was some kind of a bid and clear requirement in the auction attached to it — for example, if the State paid to build the power plant and turned it over to CPV, but then they said, okay, we want to get some money back for this power plant that we built, so you're going to bid the capacity of this plant into the auction, and unless you clear, we're taking the plant away from you, or something like that, that changes the incentives of the participants in FERC's auction. And that's what is the key — So that's the conflict? Yes. Yes. That — because you're articulating it as — and correct me if I'm wrong — that the conflict is in affecting the bid price in any way, requiring it, affecting it, or determining it. Yes. It's in creating a conflict, changing the incentives of the people in the market in a way that conflicts with the market mechanism that FERC has set up. We think that shows both field and conflict preemptions. Ms. O'Connor, you have both arguments, field and conflict. If you were to win this case, would you rather win it on field or conflict? And why? I mean, I think that field preemption is probably a better way to decide the case, and it would be a broader ruling. In such a ruling, I think the Court would say that when the State does something that alters the incentives of the people that are participating in FERC's market, that is intruding on the Federal field. But, Floyd, that answers the earlier question. No, they can't give money to build a generator because that changes the incentives. The generators' costs, by definition, change if it's receiving subsidies for free. If the State is just acting completely outside of the auction with no requirement to bid into and clear in the auction, then that is not something that changes the incentives here. The costs. Why do you even need this sort of changing incentives language? Why isn't the field preemption argument more that this scheme essentially takes the rate that the auction produces and changes that rate for CPV and for all the utilities in Maryland? I think, Justice Kagan, the reason why we don't agree with that broader interpretation is because we — FERC does not think that just receiving extra money in connection with capacity that's being sold into the auction is necessarily preempted, and let me explain why. There's something that happens in this industry, a widespread practice called contracts for differences. The contracts in this case are sometimes referred to as contracts for differences, but because of the bid and clear requirement, they don't operate in the same way. Parties can enter into a hedge agreement for a general. But that's when Mr. Clement said that there's a real difference here between voluntary agreements, you know, if there's a contract for differences, fine, but that this is Maryland coming in and effectively forcing the LSEs to enter into such a contract, and by doing so, changing the wholesale rate. Well, I think the problem that FERC sees with this is the effect that it has on the auction. If this was just a bilateral contract occurring outside of the auction where Maryland was accepting the results of a competitive procurement and then submitting that bilateral contract to FERC for review, that's where FERC would review that contract. The field that we're talking about here is the auction, and what FERC is concerned about here is the effects on the auction of a State program like the one here that ties a subsidy or extra payments under the contract to a requirement that the person receiving it bid into and clear the capacity in the auction. Roberts, how far is your, how far do you think your authority reaches with respect to indirect effects on the auction? I guess that was the point of my question on the subsidies. I mean, a lot of things are going to have an effect on the auction. Is it only because of the legal mandate in this case? Yes. It's because the program in this case, by requiring the capacity to be bid into the auction, we recognize that in the context of the Federal Power Act, the State has its sphere too. The State regulates retail rates. The State has control over generation, and it can do things within that sphere that have indirect effects on FERC's field. But in this case, the problem is that because of the bidding and clearing requirement, it's directly altering the incentives of the people in that market. Why doesn't the MOPR correct the problem? The MOPR corrects it to some extent because the MOPR is choosing what FERC thinks is a fair price for a new generator to bid in at. The MOPR isn't a complete solution because, as we've described in our brief, if somebody bids in at the minimum offer price rule, but its costs are actually higher, it is necessarily going to knock somebody out of the auction that would have cleared otherwise, and the price of the auction will go down. But, and I think, as Mr. Clement correctly pointed out, the MOPR is not a perfect solution to this. In this particular case, I think the incentives of what was happening under the State program is demonstrated by the fact that CPV tried to bid in so low, even when it tried to cost-justify their bids. And the market monitor in PJM, when trying to actually reconstruct CPV's costs, came to different numbers on what those costs would be. So it's not a perfect way to try to screen out offers that are not actually based on cost or that should not be coming in. And additionally, just the fact that FERC had to expand the MOPR to cover this program, I think shows that there's been an intrusion onto FERC's field. FERC has tried to correct what's happening in these programs through extending the minimum price offer rule to these bids, but I think that just shows that what's happening here is that the State programs are changing the incentives of the people in the field. Kagan. Well, but I don't see how that could be true. If FERC could, in fact, get rid of the problem, then it leaves you with no conflict. I don't think that's right. I think the conflict is still with the market mechanism that FERC has set up in order to determine wholesale capacity rates in the auction. When you have a program that has this bid and clear requirement, it alters those incentives. Even if there's not an actual price suppressive effect, the possibility for a conflict or the imminent possibility of a conflict still calls for field preemption. The Court of Appeals cited Schneiderwind and Northern Natural Gas on page 21A of the petition appendix, showing that that's still field preemption. What FERC is concerned about is the effects of the State program on the participants in its auction. In this particular the way that these contracts are constructed, CPV is going to get the contract price regardless of whether the clearing price is lower or higher. Breyer, what are the words of the field preemption thing that puts outside the preemption the thing that's worrying the Chief Justice? I mean, you want to say the field is so defined as, and now, look, billions of actions of States affect the cost of the generator and thereby affect the bid price into the PJM auction. Now, 99.9999 percent, we want the State to do their perfectly free to do. But you want this 1 percent, no. And I want the words that are going to define that field. That's what Justice Sotomayor was asking for before. It's something to do with the rule here in Maryland that forces them not just to have these artificial costs, but to put it on the auction. What are the words? I think directly targeting the auction to take some words from One Oak would be a fine way to do it. The field that we're talking about is the PJM auction. And any State program that directly targets the auction and the incentives of the participants in that auction by the bid and clear requirement would be preempted under a field preemption theory. We think also under a conflict preemption theory. I could distinguish just a little bit the contracts for differences that are not tied to a bid and clear requirement in the auction. The parties in this context will sometimes enter into a hedge agreement where they agree on a price like $100. If the auction clearing price is below that, say it's $80, then the person that the generator has contracted with, like Merrill Lynch or something, owes the generator $20 regardless of what else happens, that transaction will always take place. The generator then has to make a separate decision of whether it wants to bid into the auction. If the auction price is $80 and its costs are $90, it's not going to. If its costs are $70, it will bid in. That sort of a contract for differences is not preempted here. It's just when there's a bidding and clearing requirement that the subsidy is tied to. Thank you, counsel. Mr. Strauss, you have three minutes remaining. Thank you, Your Honor. We did not, Maryland did not require CPV to bid into the auction. CPV agreed to do so in response to a competitive procurement. FERC has no issue with competitive procurements, and that can be found in the joint appendix at page 909. There is a regulation in which FERC essentially says so. That's all that happened here. The question of whether we targeted the auction, we did not regulate the auction, we could not regulate the auction. We could not regulate CPV either. They're a wholesale generator, they make their own choices, and they made their own agreement here to enter into this contract. We couldn't regulate the outcome of the auction because FERC regulates the outcome of the auction. They control every aspect of it. And in this case, what FERC found was a rule change was needed to address this very contract. The change was made, the resource bid in accordance with the rule change, and cleared. FERC said its rule change would reconcile the tensions between state policy and auction integrity. FERC said that this resource was economic, needed, competitive, and did not suppress prices. There was no undue price suppression or no artificial price suppression from this resource. FERC said that and said it more than once, even with the state subsidy. And the reason is very clear, because the bid was a cost-based bid without regard to the contract revenue. And keep in mind, there's been a lot of talk about a subsidy here. Maryland concluded that over the life of this contract, this was going to be a better deal for rate payers than for the generator, and that is in the generation order. The only other point I would make, Your Honor, is that the rule that should be articulated here is one that allows each of the parties to fulfill their responsibilities under the statute. Sellers get to set rates as an initial matter. FERC gets to review those rates, and states get to direct the procurement decisions of their retail utilities. There's been a lot of talk here about what the retail utilities were forced to do. They're subject to state regulation. State courts have affirmed what Maryland did here with respect to its retail utilities. There should be no question about that. States can take actions where necessary to develop new power plants. As we move forward into an era of a new generation portfolio in this country, the last thing the Court should be considering is trying to limit state options. It's very important to keep them open, especially in a case here where FERC has reviewed this precise contract. If you look on page 6 of our reply brief, there's a quote from the FERC rehearing order in November of 2011 in which FERC describes an acceptable arrangement and describes this arrangement, one in which local utilities contract with a generator, and the generator bids the unit into the market. That is exactly what happened under this contract. FERC speaks approvingly of it. Thank you, Your Honor. Thank you, counsel. The case is submitted.